UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

WARREN SMITH,                          :

                    Petitioner,        :          **OPINION**

        - against -                    :          05 Civ. 7849 (DC)

GARY GREEN, Superintendent of          :
of Great Meadow Correctional
Facility,                              :

                    Respondent.        :

- - - - - - - - - - - - - - - - - -x


**APPEARANCES:**     WARREN SMITH
                     Petitioner, <u>Pro</u> <u>Se</u>
                     Great Meadow Correctional Facility
                     P.O. Box 51
                     Comstock, New York 12821

                     ELIOT SPITZER, Esq.
                     Attorney General for the State of New York
                     Attorney for Respondent
                          By: Luke Martland, Esq.
                              Chelsea Chaffee, Esq.
                              Assistant Attorneys General
                     120 Broadway
                     New York, New York  10271


**CHIN, D.J.**

         <u>Pro</u> <u>se</u> petitioner Warren Smith petitions this Court for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Smith was

convicted of one count of Robbery in the First Degree and one

count of Burglary in the First Degree.  He was sentenced as a

second felony offender to two concurrent twenty-five year prison

terms.  Smith contends that his constitutional rights were

violated because: (1) he was not afforded due process during his

grand jury testimony; (2) his second trial violated his double

jeopardy rights; (3) he was denied the opportunity to be present during all material phases of his trial; (4) he was denied the right to testify at his trial; and (5) he received ineffective assistance from his trial counsel. For the reasons that follow, the petition is denied.

<strong><u>BACKGROUND</u></strong>

**I.   <u>The Facts</u>**[1]

Smith was convicted of robberies at two hotels, the Quality Inn and the Milford Plaza. The instant habeas petition challenges the conviction for the Milford Plaza robbery, but the facts of both robberies -- as well as an additional attempted robbery at the Milford Plaza -- are set forth below.

**A.   <u>The Quality Inn</u>**

On May 15, 1999, Cheuk and David Gin were guests at the Quality Inn Hotel and Suites in Manhattan. (Tr.[2] 96, 128-29). A security camera showed Smith entering the premises at 7:01 a.m.

---

[1]   Neither party has submitted a complete copy of the trial transcript, and respondent represents that he has been unable to obtain the transcript. (<u>See</u> Chaffe Declaration In Opposition to Petition for a Writ of Habeas Corpus Exhibit (hereafter "RX") A). The Court can nonetheless decide the instant petition without the transcript. Rule 5(c) of the Rules Governing § 2254 cases permits the use of "a narrative summary of the evidence" in lieu of an unavailable state court transcript. <u>See</u> <u>Bundy v. Wainwright</u>, 808 F.2d 1410, 1415 (11th Cir. 1987) ("If no summary transcript is available, a narrative summary may be furnished."). Further, petitioner appears to have his own copy of the record and has attached some of the relevant portions in support of his petition. (Pet. Mem. at 41, Ex. E). Finally, respondent submitted copies of the parties' Appellate Division briefs, both of which include narrative summaries of the record and excerpts of the trial transcript. (RXs B, C).

[2]   References to "Tr." are to pages of the transcript from petitioner's first trial

and standing in the lobby at 7:20 a.m.. (Tr. at 229, 231). At approximately 7:15 a.m., petitioner knocked on the Gins' door and stated that he had to check a leak in the bathroom. (Tr. at 97, 129-30). Petitioner pretended to examine the bathroom and then threatened that he would "blow [Cheuk's] fucking head off" if he did not lie on the floor. (Tr. at 102-04, 120-23, 131). Smith took $700 from Cheuk's wallet and $200 from David's pants pocket. (Tr. at 104-05, 121-22, 132-35). Cheuk stood up during the robbery, and petitioner punched him in the side of the head before running out the door and down the stairs. (Tr. at 106-07, 135).

### B. **The Milford Plaza**

On May 26, 1999, Kevin Ferguson was staying as a guest in room 1452 at the Milford Plaza Hotel in Manhattan. At approximately 8:25 p.m., petitioner knocked on Ferguson's door, identified himself as a maintenance worker, and stated that he needed to check the bathroom for a leak. Ferguson refused to open the door and threatened to call the hotel manager. Smith promptly left. Ferguson then went to the lobby and described the incident to a hotel security officer named Robert Noonan. (RX B at 5-6; RX C at 3-4).

At approximately 8:30 p.m., petitioner knocked on Michael McNulty's door in room 841 of the Milford Plaza and made a similar request. McNulty let Smith in, but he became suspicious after noticing that petitioner lacked a toolkit. McNulty gathered his wallet, some loose money, and a bank

envelope containing $50. As McNulty moved towards the room's door, Smith approached him and said, "[y]ou know what this is." Smith then put his hand in his left pants pocket and told McNulty not to "do anything."[3] (RX B at 6-7; RX C at 4-6).

Smith ordered McNulty to get on the floor and pulled the phone cord out of the wall. He took McNulty's cash and wallet, and he asked for the pin numbers for the credit cards. McNulty said he did not know the numbers and an argument ensued. Smith eventually took the $50 from the bank envelope. Before leaving, Smith threatened that he would return if McNulty did not remain on the floor for ten minutes. McNulty waited ten seconds, reconnected the phone, and called hotel security to report the robbery. (RX B at 7; RX C at 6-7).

Security guard Robert Noonan received McNulty's call in the lobby at the same time that Ferguson was describing Smith to him. Noonan immediately noticed a man in the lobby matching the description given by Ferguson. Ferguson confirmed that the man was Smith. Noonan asked him to remain in the hotel, but Smith rushed down a stairway that led to the street. Noonan and Ferguson followed him into a subway station and yelled for police. (RX B at 6; RX C at 9-10).

Officer Thomas Renna was in the station and responded to their shouts. He testified that he saw Smith appear to throw something on the subway tracks. Officer Renna did not see the

---

[3] McNulty testified at trial that he believed Smith had a gun. (RX C at 6).

object, but he heard a "tick of metal" hit the track before he apprehended and arrested Smith. Police stopped the subway trains that night for approximately three minutes to conduct a search for the object Smith discarded. Officer Renna testified that none of the officers were certified to go down on the tracks, but that he believed the search from the platform was sufficient to uncover any "large-sized weapons." Their efforts, however, were fruitless. (RX C at 10-12).

A post-arrest search at the police station found $69 in cash in Smith's right rear pants pocket.

## II. Procedural History

### A. Grand Jury Proceedings

On June 1, 1999, petitioner appeared before the grand jury with his attorney, waived immunity, and testified. He was cross-examined by an Assistant District Attorney. Following that testimony, Smith filed motions to dismiss, both pro se and through counsel, alleging prosecutorial misconduct relating to his grand jury appearance. The Honorable Carol Berkman reviewed the grand jury minutes and denied the motions on September 22, 1999. (RX C at 23).

### B. The Indictments

A New York County Grand Jury indicted Smith on June 14, 1999 for the robbery of Michael McNulty. He was charged with one count of Robbery in the First Degree and one count of Burglary in the First Degree. On November 1, 1999, petitioner was separately indicted on one count of Burglary in the First Degree and two

counts of Robbery in the Second Degree for the robbery of Cheuk and David Gin.  The two indictments were consolidated.  (Pet. Mem. Ex. A).

### C.   **The First Trial**

Petitioner's trial with respect to both the McNulty and the Gin robberies started on March 3, 2000 before Judge Ira Beal.[4]  The jury began deliberations during the afternoon of March 8, 2000.  On that day, it requested the police complaint filed by McNulty, several legal instructions, and readbacks of McNulty's testimony.  (Tr. 361-63).  The judge told the jury that the police report was not in evidence, and re-read portions of the testimony and charges on the morning of March 9, 2000.  (Tr. 362-73).

The jury subsequently sent a note to Judge Beal that asked: (1) whether McNulty had to believe that petitioner possessed a firearm to be found guilty; (2) whether the weapon had to have actually been a firearm; and (3) what would happen if it was unanimous on three of the charges but could not reach verdicts on the remaining two.  (Tr. 375-80).  Petitioner's counsel suggested that the court re-read the initial jury instructions to answer the first two questions.  (Tr. 375).  The

---

[4]    The evidence adduced at the first trial is summarized in Magistrate Judge Francis' Report and Recommendation on Smith's petition for a writ of habeas corpus regarding his conviction for the Gin robbery.  <u>Smith v. Duncan</u>,  03 Cv. 910 (JCF), 2004 US Dist. WL 859201, at *1-4 (S.D.N.Y. Apr. 21, 2004).  Judge Denise L. Cote adopted Magistrate Judge Francis' recommendation and rejected the petition.  <u>Smith v. Duncan</u>, 03 Cv. 910 (DLC), 2004 US Dist. WL 1857570, at *6 (S.D.N.Y. Aug. 10, 2004).

judge then took a partial verdict, and the jury convicted Smith on the charges relating to the robbery of the Cheuk and David Gin. (Tr. 381-85). In response to the remaining questions, the judge followed Smith's counsel's suggestion and relied on the jury instructions in his answers. He told the jury that "[i]t must appear by sight, touch or sound [to the victim] that he is threatened by a firearm" and that "the defendant's conduct must reasonably lead the victim to believe that a gun was being used during the robbery." (Tr. 386). The jury continued deliberating on the charges relating to the McNulty robbery, and received additional readbacks of testimony throughout the day. (Tr. 387-91).

In the afternoon the jury sent another note indicating that it was deadlocked. (Tr. 391). The prosecutor requested an <u>Allen</u> charge, and Smith's counsel made no comments or objections. (Tr. 392). The judge told the jury that he had "no reason to think if the next jury were to try it again, it would be any brighter than you people," and:

> While perhaps the minority viewpoint may be a correct one, I would like you to take another shot at deliberation, and I would like the people who are in the minority to give some thought as to whether perhaps the majority, whatever that viewpoint might be, is not the correct one. And I would appreciate, it's still comparatively early in the day, if you would make another attempt at a verdict in this case, please. So if you would.

(Tr. 392-93). After the jury left the courtroom, Smith's counsel objected to the instruction, particularly "that portion in which [the court] said that the minority might want to take into

account what the majority is thinking."  (Tr. 393).

At approximately 3:00 p.m., the jury sent another note indicating that it was evenly divided on the remaining counts of the indictment.  (Tr. 394).  The judge asked if there were any applications or comments, and Smith's counsel replied "I leave it to the Court's discretion."  (Id.).  Smith's counsel noted that the jury had only deliberated for half an hour since the last note, and requested that the judge ask if additional deliberation might be useful.  (Id.).  The judge agreed, and asked petitioner's counsel, "[y]ou are not asking for a mistrial in this case?"  (Tr. 394-95).  He said that he was not.  (Tr. 395). The judge then asked the jury:

> Do you think there's any useful purpose to having deliberations continue? What are your views on that?
>
> I'm going to ask you individually whether you think the jury is helplessly, hopelessly -- a better choice -- hopelessly hung on the first two counts . . . .

(Tr. 395-96).  When polled, each juror agreed that the jury was "hopelessly hung."  (Tr. 397-98).  The court then declared a mistrial, noting that "[a]ll twelve jurors felt there would be no point to continuing negotiations or discussions among the jurors. So . . . I declared a mistrial . . . ."  (Tr. 399).  Petitioner's counsel made no objection.  (Id.).

Smith was sentenced as a violent felony predicate offender for the robbery of the Gins.  He received concurrent prison terms of twenty years on the burglary count and twelve years on each robbery count.  See People v. Smith, 283 A.D.2d 208

(1st Dep't 2001), <u>leave denied</u>, 96 N.Y.2d 907 (2001).

        D.    **The Second Trial**

        Smith's retrial on the charges relating to the McNulty
robbery began on June 5, 2000, before the Honorable Budd G.
Goodman.  Kevin Ferguson and Robert Noonan testified about their
encounters with petitioner on May 26, 1999.  (RX C at 3-4, 9-10).
Police Officers Arthur Caddigan, James Friel, Gregory Young, and
Thomas Renna described their observations from that day and their
investigation of the robbery.[5]  (RX C at 8 n.4, 10-11).  Michael
McNulty testified that he saw the outline of something that
looked like a gun in Smith's pocket, Smith appeared to be
pointing the object toward him, Smith threatened to use the
object, and he believed Smith had a gun.  (RX C at 6).

        During McNulty's redirect examination, Smith said
"something unintelligible."  (Tr2.[6] 329).  The judge told Smith
to "be quiet" and excused the jurors from the courtroom.  (<u>Id.</u>).
Before the jury was gone, petitioner stated:  "I'm all right.
Letting this D.A. come in here and say this man is here.  I ain't

_____

        [5]    There was conflicting evidence at trial regarding the
total amount of cash taken from McNulty's room.  A police report
dated May 27, 1999, by Detective Arthur Caddigan indicated that
McNulty reported $50 stolen.  (Pet. Mem. Ex. D).  Officer James
Friel testified that McNulty told him $69 was taken.  (RX C at 8
n.4).  McNulty testified that Smith took between $67 and $69 from
his hotel room -- the sum of the $50 from the envelope and his
loose cash.  (<u>Id.</u>).  He also testified that he did not tell
police that only $50 was taken or that his wallet had been
stolen.  (<u>Id.</u>).  These discrepancies were the partial basis for
multiple outbursts by petitioner during the trial.

        [6]    References to "Tr2." are excerpts of pages provided by
petitioner from the transcript of the second trial.  (<u>See</u> Pet.
Mem. Ex. E).

going to be quiet." (Id.). He added: "I got railroaded before. I'm not getting railroaded again, and you know you lying. Tell me you ain't say that to the police. I ain't took nothing." (Id.). After the jury was excused, the judge instructed Smith's counsel to "go back and tell your client the next time he makes an outburst in this courtroom he will be removed from the trial permanently." (Tr2. 330).

Before the jury returned, Smith's attorney reported to the judge that it "might make [Smith] a lot happier" if he could reopen his cross-examination of McNulty to ask him about the police report that was based on his complaint. (Id.). The court granted the request and Smith was brought back into the courtroom. (Id.). Petitioner then asked to speak with the judge, but his request was denied. (Tr2. 331). Smith interjected, "[t]his is my life on the line." (Id.). The judge responded that he had adequate representation, he would have an opportunity to testify, and he would forfeit his right to be present at the trial if there were further problems. (Id.).

Smith remarked, "I don't want to make no outburst. . . but you know what you're doing to me, Your Honor." (Tr2. 331). He then alleged that the State had failed to turn over "Grady [sic] material" and that McNulty's testimony was inconsistent with his statements to the police. (Tr2. 331-32). The judge warned Smith that if he disrupted the proceedings again he would forfeit his right to be present at the trial. (Tr2. 332). Smith stated:

>     After I got a hundred years already, Your Honor.
> And, you know what, a foreperson on the jury said I
> wasn't guilty.  And I got the papers, and I still got a
> hundred years.  The foreperson got up and said I wasn't
> guilty.  What kind of fair trial am I getting?  Tell me
> that.  I know that.

(<u>Id.</u>).  Following this statement, the judge ordered the court

officers to remove petitioner.  (<u>Id.</u>).  Before they could do so,

Smith called the judge "a dirty, lying racist fool."  (<u>Id.</u>).

     After petitioner's removal, the judge advised his

counsel to warn him that "the next time he raises his voice to me

or talks in front of the jury, he will forfeit his right [to be

present] for the rest of this trial.  I will not put up with

that."  (Tr2. 333).  After lunch, petitioner's counsel said that

Smith assured him he would "behave," and asked that he be given

"another minute to chill out" before the proceedings resumed.

(Tr2. 334).  When Smith reentered the courtroom, the judge

instructed him as follows:

>     Mr. Smith, this is the very last time that I am
> going to say this to you.  You're going to either act
> like a gentleman in this courtroom [sic].  If you do
> not, you will forfeit your right to be present and
> we'll proceed without you.  That's your decision.

(Tr2. 334-35).  Smith apologized, and the proceedings resumed.

His counsel attempted to impeach McNulty's testimony by using the

police report, and the judge asked McNulty additional questions

on the subject.  (Tr2. 336-37).

     After the lunch recess that day, during the cross

examination of Robert Noonan, Smith made the following statement

to the jury:

Excuse me. I would like you all to know that I'm already doing 20 years in prison for this crime. . . . They never convicted me. I'm innocent. They violated my constitutional rights, this man right there. I'm already in prison for 20 years for this right here that they never found me guilty of.

(Tr2. 357). Petitioner was removed and the judge instructed the jury to disregard his statement. (Tr2. 357-58). The following discussion took place out of the presence of the jury:

THE COURT: For the record, once again, the Defendant has created an outburst. . . . So he has now been removed from the courtroom and will not be allowed back in.

MR. FARBER: Your Honor, I would -- I believe we should make some sort of effort to allow my client to at least --

THE COURT: We're not. I will not. I had warned him that if he acted out again he will be removed. He has done that. . . .

MR. FARBER: My client did indicate to me at some point that he may be interested in testifying at trial. Should he desire to testify --

THE COURT: Then we'll let him take the stand at that point, but he's waived his right to be present during the rest of the trial. . . .

MR. FARBER: In terms of him being able to possibly watch the trial through video?

THE COURT: We don't have that facility here. He's waived his right. Bring in the next witness.

(Tr2. 365-66). The prosecution rested later that afternoon and Smith's counsel was asked to find out whether Smith intended to testify. (Tr2. 435). He spoke with petitioner and reported that: "I asked him with respect to testifying as to the allegations in this case, and he indicated that he does not intend to talk about that." (Tr2. 436).

The judge followed up the next day by addressing petitioner directly:

THE COURT: [Y]ou have forfeited your right to be present during the trial by your act. However, since this is a serious case and your lawyer has indicated you want the opportunity to testify on your own behalf, I'm going to allow you to do that. But I'm telling you now, the first time that you open your mouth and you say anything other than what happened in this incident, I will eject you from the courtroom and you will forfeit your right to be present any further [sic] during this trial. Do we understand each other, sir? Do we understand each other?

THE DEFENDANT: Sir, I'm an innocent man. I'm going to get up there to prove my innocence. I've got documents from the D.A. and the police department to prove my innocence. And you're telling me that I can't get up there and tell these people that?

THE COURT: I'm telling you --

THE DEFENDANT: Why don't you tell the people the trial was a trial already and the jury never found me guilty and I'm sitting in jail for 20 years now. . . .

THE COURT: Put him in.

THE DEFENDANT: I know, "Put him in." You're the one that gave me my trial. Why don't you tell them that. A jury went to this trial and never found me guilty, but I'm sitting in jail for 20 years.

THE COURT: You were found guilty.

THE DEFENDANT: Why? I ain't got no reason to lie. I got the minutes from the trial. Let the jury see that if you want to be fair. You talk about integrity and God we trust.

(Tr2. 448-49). Smith was then removed from the courtroom. The prosecutor stated for the record that he had "yelled at the Court" and that "his voice was raised loudly . . . in a threatening way." (Tr2. 449). The judge said, "it's obvious to this Court that by bringing the Defendant out he's only going to

be disruptive once again. . . . I am removing him from the courtroom." (Tr2. 451). Smith's counsel objected for the record (id.), and the trial proceeded to conclusion. Petitioner was convicted of First Degree Burglary and First Degree Robbery, and was sentenced to concurrent determinant prison terms of twenty-five years on July 26, 2000.

   E.   **Exhaustion of State Remedies**

      Prior to his direct appeal, Smith filed a pro se motion to vacate the judgment pursuant to New York Criminal Procedure Law (hereafter "N.Y.C.P.L.") § 440.10. Petitioner argued that the court prematurely declared a mistrial at the first trial and that the second trial violated his Fifth Amendment double jeopardy rights. The trial court denied the motion pursuant to N.Y.C.P.L. § 440.10(2)(c), reasoning that the record was sufficiently clear to permit adequate review of his claims by the Appellate Division. (RX F).

      Smith's conviction for the Milford Plaza robbery was affirmed by the Appellate Division. People v. Smith, 12 A.D.3d 219 (1st Dep't 2004). The court rejected petitioner's double jeopardy claim, finding that his counsel consented to the mistrial and that it was properly declared after the jury twice indicated it was deadlocked. Id. at 220. The court also held that: Smith's disruptive conduct justified his removal from the courtroom, he forfeited his right to testify through his outbursts, and the testimony he proffered was irrelevant. Id. The New York Court of Appeals denied his motion for leave to

appeal.  <u>People v. Smith</u>, 4 N.Y.3d 836 (2005).

**F.    The Habeas Petition**

Smith's habeas petition, dated August 17, 2005, challenging the conviction for the McNulty robbery was received by this Court's <u>Pro Se</u> office on August 25, 2005.  Respondent filed papers opposing the petition on December 30, 2005. Petitioner's motion for appointment of counsel pursuant to 18 U.S.C. § 3006(A) was denied on October 11, 2005.  His subsequent motion for appointment of counsel pursuant to 28 U.S.C. §§ 1915(d) and (e), filed on February 7, 2006, is hereby denied as well.

**DISCUSSION**

**I.    Federal Review of State Convictions**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." <u>Williams v. Taylor</u>, 529 U.S. 362, 399 (2000).  AEDPA sets forth new standards of review that make it more difficult for a habeas petitioner to obtain federal relief from a state conviction. AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

AEDPA has been interpreted to require a petitioner to show not only that clearly established federal law was erroneously or incorrectly applied, but that the application was unreasonable. See Williams, 529 U.S. at 411; Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002). As the Second Circuit has explained: "A state court decision is 'contrary to' Supreme Court precedent only if it either 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite result].'" Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001) (quoting Williams, 529 U.S. at 405). The standards set forth by AEDPA apply to all habeas petitions filed after the statute's effective date of April 24, 1996. See Boyette v. Lefevre, 246 F.3d 76, 88 (2d Cir. 2001) (citing Williams, 529 U.S. at 402).

Federal courts may evaluate habeas corpus petitions only if the petitioner has exhausted his state remedies, i.e., he (1) has "fairly presented" his federal claims to the state's highest court and (2) "has utilized all available mechanisms to secure appellate review of the denial of [his] claim." Picard v. Connor, 404 U.S. 270, 275 (1971); Klein v, Harris, 667 F.2d 274, 282 (2d Cir. 1981); see also 28 U.S.C. § 2254(b)(1)(A). A

petitioner may fulfill these requirements by directly appealing or collaterally attacking his conviction in the highest state court on the same factual and legal basis presented in his federal habeas petition.  See Klein, 667 F.2d at 282.

AEDPA provides that a district court may deny a claim "on the merits," even if the petitioner has failed to exhaust his state court remedies.  28 U.S.C. § 2254(b)(2).

## II.  **Petitioner's Claims**

Smith contests his conviction on the following grounds: (1) the grand jury proceedings violated his due process rights; (2) the second trial violated his right against double jeopardy; (3) he was denied the opportunity to be present at all material stages of the trial; (4) he was denied the opportunity to testify at his trial; and (5) his trial counsel was ineffective.

Respondent concedes that the petition is timely and that petitioner has exhausted his claims in the New York State courts.  (See Resp. Mem. at 17-18).  Consequently, I address petitioner's claims on the merits.

### A.  **The Grand Jury Proceedings**

Petitioner argues that his due process rights were violated during the grand jury proceedings.  Specifically, Smith alleges that the indictment was voted on before his testimony and that the prosecutor prejudiced the grand jurors by asking questions about security photographs of him at other hotels.[7]

_____

[7]     In his habeas petition contesting his conviction for the Gin robbery, Smith argued that he was denied the right to counsel during his testimony before the grand jury regarding

## 1.  **Applicable Legal Standards**

The Constitution does not obligate states to indict defendants by grand juries.  LanFranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002).  Accordingly, errors in state grand jury proceedings are questions of state law and therefore not reviewable on a petition for a writ of habeas corpus.  Mirrer v. Smyley, 703 F. Supp. 10, 11-12 (S.D.N.Y. 1989).  Furthermore, any potential defect in a grand jury proceeding is cured by a subsequent conviction.  United States v. Mechanik, 475 U.S. 66, 70 (1986); see also Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989) (holding that claims of error in grand jury proceedings may not be raised where a properly instructed jury convicted at trial); Cadilla v. Johnson, 119 F. Supp. 2d 366, 371 (S.D.N.Y. 2000) ("a jury conviction transforms any defect connected with the grand jury's charging decision into harmless error").

## 2.  **Application**

Petitioner's claim of error in the grand jury proceedings is rejected.  First, it is not reviewable on a federal habeas petition because it is a matter of state law.  Second, even assuming the claim is reviewable by federal habeas petition, it still fails.  The grand jury minutes were reviewed by both the trial court and the Appellate Division (see RX C at 23 n.13), and each court rejected Smith's claims.  People v. Smith, 12 A.D.3d 219, 221 (1st Dep't 2004), leave denied, 4

---

those charges.  Judge Cote denied petitioner's claim.  Smith v. Duncan, 03 Cv. 910 (DLC), 2004 US Dist. WL 1857570, at *4 (S.D.N.Y. Aug. 10, 2004).

N.Y.3d 836 (2005). Neither decision was contrary to clearly established federal law. Petitioner does not attribute clear error to the factual findings of the lower courts regarding the grand jury proceedings, nor has he attempted to show that their holdings were "objectively unreasonable." Williams, 529 U.S. at 409; see also 28 U.S.C. § 2254(d).

Third, the petit jury convicted Smith based on the evidence presented at trial. Thus, any alleged error resulting from the grand jury proceedings is "harmless beyond a reasonable doubt." Mechanik, 475 U.S. at 68 (citing Chapman v. California, 386 U.S. 18, 24 (1967)). Therefore, the state courts did not violate petitioner's due process rights by denying his motions regarding the grand jury proceedings.

## B. Double Jeopardy Claim

Smith argues that the declaration of a mistrial at his first trial on the charges relating to the McNulty robbery was inappropriate as a matter of state[8] and federal law, and that the second trial violated his Fifth Amendment right against double jeopardy. I cannot review the merits of the state law issue. See 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus . . . only on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."). Petitioner does present a reviewable issue of federal law, however, when he

---

[8]     Smith argues that the declaration of the mistrial violated N.Y.C.P.L. §§ 310.30, 310.60(1)(A), 310.70(1)(b)(i), and 310.80. (See Pet. Mem. at 3).

argues that the declaration of the mistrial and the subsequent retrial violated his Fifth Amendment right against double jeopardy.

### 1.  **Applicable Legal Standards**

It is well-settled that the Double Jeopardy clause is not violated when a state retries a defendant after a mistrial that is declared out of "manifest necessity."  See Richardson v. United States, 468 U.S. 317, 324 (1984).  "A jury's declaration that it cannot arrive at a verdict is the 'prototypical example' of a situation in which the declaration of a mistrial becomes a manifest necessity."  Hymes v. Leonardo, No. 96 Civ. 2207 (BSJ), 1999 U.S. Dist. WL 31484, at *5 (S.D.N.Y. May 19, 1999); see also United States v. Chestaro, 197 F.3d 600, 610 (2d Cir. 1999). Unless the prosecution or the court acts in a manner intended to provoke a defendant to move for a mistrial, no "manifest necessity" analysis is required when a defendant consents. Oregon v. Kennedy, 456 U.S. 667, 679; see also Maula v. Freckleton, 972 F.2d 27, 29 (2d Cir. 1992) (per curiam).

### 2.  **Application**

Smith's constitutional rights were not violated because the judge declared a mistrial at his first trial out of "manifest necessity," and Smith, through counsel, consented.

First, the trial court's decision to declare a mistrial out of "manifest necessity" is entitled to deference by a reviewing court.  See Arizona v. Washington, 434 U.S. 497, 510 (1978).  Deliberations lasted for approximately one and a half

days, and the jury sent two notes indicating deadlock. The court gave an <u>Allen</u> charge after the first note, and polled the jury after the second. All the jurors agreed that they were "hopelessly hung." Under these circumstances, petitioner cannot show that the court's conduct in declaring a mistrial was "objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003).

Second, Smith's counsel consented to the mistrial by his words and actions. <u>See</u> <u>Maula</u>, 972 F.2d at 29. He did not object to any of the judge's decisions during the deliberations. <u>See</u> <u>id.</u> (citing <u>United States v. Goldstein</u>, 479 F.2d 1061, 1067 (2d Cir. 1973)). Then, following the jury's note that it was evenly divided, petitioner's counsel verbally consented to the mistrial by "leav[ing] it to the Court's discretion."

The court's decision to declare the mistrial was made with verbal consent of petitioner's counsel, without objection, and under circumstances of "manifest necessity." Thus, Smith's subsequent conviction did not violate his Fifth Amendment right against double jeopardy.

C. **Presence at Trial**

Petitioner argues that his removal from the courtroom during the trial violated his Fifth and Sixth Amendment rights to be present at all material stages of the proceedings.

1. **Applicable Legal Standards**

A defendant's constitutional right to be present during all material stages of the trial is derived from the

Confrontation Clause of the Sixth Amendment and the Due Process
Clause of the Fifth Amendment. <u>United States v. Gagnon</u>, 470 U.S.
522, 526 (1985) (per curiam). This right may be forfeited,
however, if a defendant conducts himself in a "disorderly,
disruptive, and disrespectful" manner that prevents the trial
from being conducted with him present. <u>Illinois v. Allen</u>, 397
U.S. 337, 343 (1970). The Second Circuit has interpreted <u>Allen</u>
to permit a trial judge to exclude a defendant from the trial
even without a warning. <u>Gilchrist v. O'Keefe</u>, 260 F.3d 87, 97
(2d Cir. 2001). Nonetheless, forfeiture of this right need not
be absolute: "the right to be present can, of course, be
reclaimed as soon as the defendant is willing to conduct himself
consistently with the decorum and respect inherent in . . .
judicial proceedings." <u>Allen</u>, 397 U.S. at 343.

     2. **Application**

     Smith forfeited his right to be present at the trial by
his repeated misconduct, despite warnings from both his counsel
and the trial judge. His two outbursts in front of the jury
included statements about his previous trial and prison sentence.
At a different point in the proceedings, he called the judge a
"dirty, lying racist fool." Although he could have regained his
right to be present by obeying the court's order that he "act
like a gentleman in this courtroom" (Tr2. at 334), Smith was
disruptive after each of the three times the judge warned him of
the consequences for his misconduct. <u>See</u> <u>Allen</u>, 397 U.S. at 343.
Following the third warning, there was no reason for the judge to

believe that petitioner would comply with his admonishments, and Smith's constitutional rights were not violated by his exclusion from the rest of the trial.

Petitioner also argues that his rights were violated because he was not provided with an alternative means of viewing the trial. It was, however, within the judge's discretion to decide the best manner in which to proceed. See <u>Allen</u>, 397 U.S. at 343 ("We believe trial judges confronted with disruptive . . . defendants must be given sufficient discretion to meet the circumstances of each case."). First, the courtroom was not equipped to provide video access, and the court was not obligated to invest in that technology. See <u>Franco v. Costello</u>, 322 F. Supp. 2d 474, 477-78 (S.D.N.Y. 2004) ("There is no Supreme Court case addressing whether and to what extent a trial court must set up access to counsel during a defendant's removal from the courtroom."). Second, the court made a reasonable effort to let petitioner participate in the trial by bringing him back into the courtroom three times after separate outbursts. By disregarding the judge's warnings, petitioner rejected the judge's attempts to include him and forfeited his right to be present at the trial. The court's decision to exclude him from the courtroom was not an unreasonable application of clearly established federal law, and petitioner's claim is rejected.

   D.  **Right to Testify**

Petitioner also contends that, after his exclusion from the courtroom, the judge's decision not to allow him to testify

violated his Fifth, Sixth, and Fourteenth Amendment rights.

### 1. __Applicable Legal Standards__

A criminal defendant has a constitutional right to testify at trial on his own behalf. <u>See</u> U.S. Const. amends. V, VI, XIV; <u>Rock v. Arkansas</u>, 483 U.S. 44, 49 (1987) ("[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense."). Though this right is well-established, it can be waived if done so knowingly and voluntarily. <u>See</u> <u>Brown v. Artuz</u>, 124 F.3d 73, 78 (2d Cir. 1997). The right to testify may also "bow to accommodate other legitimate interests" so long as any restrictions imposed are not "arbitrary or disproportionate to the purposes they are designed to serve." <u>Franco v. Costello</u>, 322 F. Supp. 2d 474, 478 (S.D.N.Y. 2004) (quoting <u>Rock</u>, 483 U.S. at 55-56); <u>see also</u> <u>Gilchrist v. O'Keefe</u>, 260 F.3d 87, 97 (2d Cir. 2001) (certain important trial related rights may be forfeited through serious misconduct).

### 2. __Application__

Petitioner forfeited his right to testify at the trial through his misconduct. In addition to providing multiple warnings before excluding Smith from the trial, the judge also made a specific inquiry into whether petitioner would comply with the court's rules during his proposed testimony. First, after a conversation with petitioner, his counsel represented to the court that "he only wants to come into court for the sole purpose of discussing the verdict of the previous trial and the fact that

it was unconstitutionally obtained."  Petitioner does not contend
that his counsel misrepresented his intentions.  Second, the
judge brought Smith into the courtroom the following day and told
him he would be permitted to testify if he limited his testimony
to the charged conduct at the trial.  Petitioner responded, <u>inter
alia</u>, "You're the one that gave me my trial. . . A jury went to
this trial and never found me guilty, but I'm sitting in jail for
20 years."

Given petitioner's previous misconduct, the trial judge
had every reason to believe that Smith meant what he said and
that he would not limit the scope of his testimony as instructed.
The judge's decision was not "arbitrary or disproportionate"
relative to the court's purpose of protecting the sanctity of the
trial.  <u>Rock</u>, 483 U.S. at 56.  Smith's proffered testimony was
irrelevant to the charges.  In fact, evidence that he had already
been convicted and sentenced for substantially similar conduct
would likely have prejudiced the jury against him.  Under these
circumstances, including petitioner's clearly articulated purpose
of continuing to disrupt the proceedings and ignore the court's
instructions, it was well within the judge's discretion to
prevent him from testifying.  Accordingly, the court's decision
did not violate Smith's Fifth Amendment rights.

    **E.**   **<u>Effectiveness of Counsel</u>**

Petitioner, relying on the arguments from his brief to
the Appellate Division, contends that his trial counsel, Curtis
Farber, was constitutionally ineffective.  He argues that

Farber's representation was deficient because he failed to request that the lesser charges of Second Degree Burglary and Second Degree Robbery be added to the indictment and he failed to assert the affirmative defense that Smith did not actually use a firearm in the robbery.

### 1.    <u>Applicable Legal Standards</u>

To prevail on an ineffective assistance of counsel claim, petitioner must satisfy the two-pronged test set forth in <u>Strickland v. United States</u>, 466 U.S. 668 (1984).  Specifically, petitioner must show that: (1) his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) he was prejudiced by counsel's deficient performance.  See <u>id.</u> at 686-88.  To demonstrate prejudice, petitioner must prove that, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different.  See <u>id.</u> at 694.

To succeed, petitioner must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  <u>Id.</u> at 689.  Judicial scrutiny of counsel's performance and trial strategy must be deferential, "evaluat[ing] the conduct from counsel's perspective at the time."  <u>Id.</u>; <u>see also</u> <u>Bell v. Cone</u>, 535 U.S. 685, 698 (2002).  "The court's central concern is not with 'grad[ing] counsel's performance,' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the

adversarial process that our system counts on to produce just results.'" <u>United States v. Aguirre</u>, 912 F.2d 555, 561 (2d Cir. 1990) (internal citation omitted) (quoting <u>Strickland</u>, 466 U.S. at 696).

## 2. **Application**

Petitioner's ineffective assistance claim rests on Farber's handling of two issues of New York law. First Degree Robbery, N.Y.P.L. § 160.15(4), and First Degree Burglary, N.Y.P.L. § 140.30(4), require that the defendant "displays what appears to be a . . . firearm." An affirmative defense to both offenses exists where the object used "was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged." <u>See</u> <u>People v. Lockwood</u>, 52 N.Y.2d 790, 792 (1980). Smith asserts that the lesser charges of Second Degree Robbery and Burglary, which do not require displaying a firearm, were more appropriate,[9] and

---

[9]    This aspect of petitioner's claim resembles a challenge to the sufficiency of the evidence. That claim was not presented in his petition, but even if it were before the Court, it would fail. In reviewing a state court conviction, a federal court should not determine whether the evidence at trial established guilt beyond a reasonable doubt, but rather "whether after reviewing the evidence in the light most favorable to the prosecution, any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>see also</u> <u>United States v. Chacko</u>, 169 F.3d 140, 148 (2d Cir. 1999). When reviewing a trial record that supports conflicting inferences, a habeas court must presume that, in convicting the defendant, the jury "resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326; <u>see also</u> <u>United States v. Rosa</u>, 11 F.3d 315, 337 (2d Cir. 1993). Under these standards, the evidence at Smith's trial was sufficient to support the conviction. Granting the appropriate inferences in favor of the prosecution, the testimony of McNulty

that Farber should have asserted the affirmative defense.

Farber's representation regarding these issues did not
fall below the objective standard of reasonableness set forth in
Strickland, nor was Smith prejudiced by Farber's failure to make
these requests.  First, Farber's strategic decisions at
petitioner's trial were reasonable.  At the first trial, in
response to the jury's question of "whether a person must believe
. . . that a defendant possessed a firearm in order to be found
guilty . . . ," Farber requested that the judge "recite . . .
what was in the original charge."  (Tr. at 375).  His comments
suggest that he was aware of the issues surrounding the gun and
that he thought court's initial instructions were sufficient.
(Id.).  Petitioner offers no evidence that Farber was less aware
of these issues at the second trial.  Moreover, the strategy was
effective in persuading at least one juror at the first trial not
to convict Smith for the charges relating to the McNulty robbery.
Therefore, it was not objectively unreasonable for Farber to
employ the same strategy at the retrial.

Second, there was little, if any, evidentiary basis for
the lesser charges or the affirmative defense.  The decision to
forgo an unsupported argument is not ineffective assistance.  See
United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000); Jennings
v. Strack, 93 Civ. 1681 (SWK), 1994 U.S. Dist. WL 163944, at *17-
22 (S.D.N.Y. Apr. 25, 1994).  The Appellate Division found that

_____

and Officer Renna was sufficient to show that petitioner
"display[ed] what appears to be a . . . firearm."  N.Y.P.L. §
160.15(4); N.Y.P.L. § 140.30(4).

"there was no evidence to support the defense," <u>Smith</u>, 12 A.D.3d at 221, and the record supports its holding. McNulty testified that the outline of the object in Smith's pocket looked like a gun, that Smith told him it was a gun, and that he believed it was a gun. Sergeant Renna also testified that Smith appeared to throw something on the subway tracks, and that he heard the tick of metal. Given the evidence at trial and the presumption of reasonableness to which Farber's conduct is entitled, I cannot find that his representation fell below the standard in <u>Strickland</u>'s first prong.

Nor has petitioner shown a reasonable probability that the verdict would have been any different had Farber requested the lesser charges or the affirmative defense. No prejudice occurs where there is "exceedingly little likelihood that presentation of the affirmative 'play pistol' defense would have succeeded." <u>Mitchell v. Skully</u>, 746 F.2d 951, 954 (2d Cir. 1984) (referring to affirmative defense to First Degree Robbery under New York law). Similarly, petitioner was not prejudiced by the lack of Second Degree Robbery and Burglary charges because the jury found that Smith was guilty of those crimes in the First Degree beyond a reasonable doubt. Smith never indicated to Farber or the judge that he intended to provide evidence that he did not possess a firearm during the crimes. Nor has he pointed to any such evidence in his motion to vacate the judgment, his appeal to the Appellate Division, or his petition to this Court. Accordingly, Smith cannot show prejudice resulting from counsel's

failure to request Second Degree Burglary and Robbery charges or the failure to assert the affirmative defense. His ineffective assistance of counsel claim fails.

## CONCLUSION

For the reasons set forth above, Smith's application for a writ of habeas corpus is denied and the petition is dismissed in its entirety. Because petitioner has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. See 28 U.S.C. § 2253 (as amended by AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this decision would not be taken in good faith.

SO ORDERED.

Dated:     New York, New York
           July 17, 2006


DENNY CHIN
United States District Judge